# UNITED STATES DISTRICT COURT
## DISTRICT OF IDAHO

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT, | Case No.: 1:15-cv-00047-REB |
| Plaintiff, | **MEMORANDUM DECISION AND ORDER RE:** |
| vs. | |
| U.S. DEPARTMENT OF INTERIOR, | **PLAINTIFF WESTERN WATERSHEDS PROJECT'S MOTION FOR SUMMARY JUDGMENT (Docket No. 22)** |
| Defendant, | |
| and | **FEDERAL DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT (Docket No. 30)** |
| IDAHO WOOL GROWERS ASSOCIATION, MINIDOKA GRAZING ASSOCIATION, and ETCHEVERRY SHEEP COMPANY. | |
| Intervenor Defendants | **FEDERAL DEFENDANT'S MOTION TO STRIKE NEW EVIDENCE (Docket No. 33)** |
| | **INTERVENOR DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Docket No. 34)** |

Currently pending before the Court are (1) Plaintiff Western Watershed Project's Motion for Summary Judgment (Docket No. 22), (2) Federal Defendant's Cross-Motion for Summary Judgment (Docket No. 30), (3) Federal Defendant's Motion to Strike New Evidence (Docket No. 33), and (4) Intervenor Defendants' Motion for Summary Judgment (Docket No. 34).  Having carefully reviewed the record, participated in oral argument, and otherwise being fully advised, the undersigned enters the following Memorandum Decision and Order:

**MEMORANDUM DECISION AND ORDER AND ORDER - 1**

# I.  INTRODUCTION

Plaintiff Western Watershed Project ("WWP") seeks review of Defendant U.S. Department of Interior's ("Interior") July 10, 2014 Office of Hearing and Appeals ("OHA") decision, upholding the Bureau of Land Management's ("BLM") decisions to allow grazing on the Big Desert Sheep Allotment ("Allotment"), as well as the accompanying Environmental Assessment ("EA") and Finding of No Significant Impact ("FONSI").  WWP's allegations are all premised on the fact that the Allotment contains greater sage-grouse habitat.

WWP generally contends that the Interior's approval of 15 BLM final grazing decisions and the environmental analyses underlying those decisions violated the National Environmental Policy Act ("NEPA"), the Federal Land Policy and Management Act ("FLPMA"), and the Administrative Procedure Act ("APA").  Specifically, through this action, WWP alleges that the EA (1) arbitrarily confined the geographic scope of its cumulative impacts assessment by excluding other allotments directly to the west of the Allotment; (2) failed to consider a reasonable alternative location for the BLM's proposed forage reserve within the Allotment; (3) failed to properly analyze the grazing decisions' impacts on wildfire frequency; and (4) contained no analysis of potential indirect impacts to relict vegetation sites found on nearby kipukas (islands of older, undisturbed/ungrazed terrain surrounded by newer lava flows), providing habitat for sage-grouse.

Now before the Court are WWP's Motion for Summary Judgment (Docket No. 22), Interior's Cross-Motion for Summary Judgment (Docket No. 30), and the Intervenors'[1] separate

---

[1]  On September 10, 2015, the Court granted Idaho Wool Growers Association's, Minidoka Grazing Association's, and Etcheverry Sheep Company's (the "Intervenors") Motion to Intervene.  *See* 9/10/15 MDO (Docket No. 26).

**MEMORANDUM DECISION AND ORDER AND ORDER - 2**

Motion for Summary Judgment (Docket No. 34).[2,3]  The issues were argued before the undersigned at the federal courthouse in Boise, Idaho.  After the considerable sederunt that follows in any administrative appeal such as this case, the Court decided such issues and now memorializes those details in this Memorandum Decision and Order.

## II.  RELEVANT FACTUAL BACKGROUND

**A.    The Big Desert Sheep Allotment and Sage-Grouse**

1.      The 236,990-acre Allotment is located in southeastern Idaho, within an expanse of the Snake River Plain known as the "Big Desert" – it includes rolling plains, lava outcrops, and other volcanic extrusions;[4] is situated 4,350-5,563 feet above sea level; and is relatively dry (averaging 8-16 inches of annual precipitation).  *See* Pl.'s SOF Nos. 1-2 (Docket No. 23) (citing AR 982, 984-85); Defs.' SOF No. 1 (Docket No. 31) (citing AR 382).

2.      The Allotment provides habitat for a variety of native plant and animal species, some of which are BLM-designated special status species, including the greater sage-grouse.  *See* Pl.'s SOF No. 3 (Docket No. 23) (citing Compl., ¶¶ 25-26 (Docket No. 1); Ans., ¶¶ 25-26 (Docket No. 9); AR 1009-10, 1014-19, 1023-24); Defs.' Obj. to Pl.'s SOF No. 3 (Docket No. 32).

3.      Sage-grouse within the Allotment are part of the Snake-Salmon-Beaverhead ID population whose trend, as indicated by average number of males per lek (sage-grouse breeding

---

[2]  Also before the Court is Interior's Motion to Strike New Evidence (Docket No. 33).

[3]  Interior separately argues that WWP's claims should be dismissed because it failed to raise them during the administrative process.  *See* Opp./Cross-MSJ, pp. 13-16 (Docket No. 30, Att. 1). Additionally, Intervenors submit that WWP failed to exhaust its administrative remedies before filing this action.  *See* Mem. in Supp. of MSJ, pp. 3-8 (Docket No. 34, Att. 1).

[4]  Approximately 54,000 acres of the Allotment lies within the Craters of the Moon National Monument and Preserve.  *See* Defs.' SOF No. 1 (Docket No. 31) (citing AR 382); *see also* Pl.'s SOF No. 4 (Docket No. 23).

**MEMORANDUM DECISION AND ORDER AND ORDER - 3**

areas), has declined by 57% from 1965-1969 to 2000-2007.  Pl.'s SOF No. 12 (Docket No. 23) (citing AR 1017).  The five-year baseline from 1996-2000 in the Allotment was 9.23 males per lek and 17.7 males per active lek.  *See* Defs. Obj. to Pl.'s SOF No. 12 (Docket No. 32) (citing AR 1017).  As of December 2012 (the date of the at-issue EA), the three-year average number of males per lek was 17.88, while the three-year average number of males per active lek was 31.25. *See id*.  There are 30 known sage-grouse leks within the Allotment and another 65 leks within five miles of the Allotment – 48% of these 95 leks are occupied; the remaining leks are undetermined, inactive, or not verified.  *See* AR 1017.

    4.       Of the Allotment's 236,990 acres, 134,840 are designated as Preliminary Priority Habitat ("PPH") for sage-grouse, and 24,807 acres are designated as Preliminary General Habitat ("PGH") for sage-grouse.  *See* Pl.'s SOF No. 3 (Docket No. 23) (citing AR 1016).

    a.       Both PPH and PGH are divided into subsets: perennial grasslands and sagebrush – all of the PPH and PGH acres in the Allotment lie within the perennial grasslands subset.  *See* AR 1016.

    b.       PPH and PGH designations within the Allotment are based on sage-grouse populations – PPH is based on combined high male lek attendance, high lek density, and high lek connectivity; PGH provides corridors connecting PPH, potential stepping stones for grouse movements within corridors, or occupied habitats characterized by low lek density.  *See* Pl.'s SOF No. 3 (Docket No. 23) (citing AR 1016).

    5.       Of the Allotment's 236,990 acres, 213,220 acres are identified as Restoration Type 1 sage-grouse habitat, and 1,287 acres are identified as Restoration Type 2 sage-grouse habitat.  *See* Obj. to Pl.'s SOF No. 3 (Docket No. 32) (citing AR 1016).  Due to past wildfires, there is limited key sage-grouse habitat identified within the Allotment.  *See id*.

**MEMORANDUM DECISION AND ORDER AND ORDER - 4**

a.      Restoration Type 1 sage-grouse habitat refers to sagebrush-limited areas with acceptable understory conditions in terms of grass species composition. *See* AR 1016. Such areas are often a result of wildfires or seedings. *See id.* The majority of the Allotment is classified as Restoration 1 sage-grouse habitat due to fires within the Allotment that have reduced sagebrush cover, forb (herbaceous flowering plants) diversity, and abundance. *See id.*; *see also* Defs.' SOF No. 3 (Docket No. 31) (citing AR 382).  While sagebrush provides critical habitat components (escape cover, nesting habitat) and food for sage-grouse, due to the limited sagebrush canopy cover and lack of forb diversity in Restoration Type 1 sage-grouse habitat areas, sage-grouse very rarely use them. *See* AR 1016.

b.      Restoration Type 2 sage-grouse habitat refers to inadequate sagebrush cover with poor understory herbaceous conditions. *See id.* Although sage-grouse may still use these sites during the winter months when the bulk of their diets are comprised of sagebrush, use during breeding and brood-rearing seasons would be limited due to the poor condition of the understory. *See id.*

6.      Ninety-two percent of the Allotment (219,617 acres) is federal public land managed by the BLM's Upper Snake Field Office. *See* Pl.'s SOF No. 1 (Docket No. 23) (citing Compl., ¶¶ 80-81 (Docket No. 1); Ans., ¶¶ 80-81 (Docket No. 9); AR 982-83).  The BLM's Upper Snake Field Office manages grazing on the Allotment, which has approximately 15 domestic sheep grazing permittees. Defs.' SOF No. 2 (Docket No. 31) (citing AR 382).  The Allotment is "common" to all permittees, meaning that there are no internal pastures and each of the permittees has access to the entire allotment during the season of use.  This leaves the Allotment largely free from internal pasture fencing. *See id.*; *see also* Pls.' SOF No. 9 (Docket No. 23) (citing Compl., ¶ 82 (Docket No. 1); Ans., ¶ 82 (Docket No. 9); AR 932, 23893).

**MEMORANDUM DECISION AND ORDER AND ORDER - 5**

**B.**      **The BLM's Rangeland Health Evaluation for the Big Desert Sheep Allotment**

7.      In early 2011, the BLM began a permit renewal process for the Allotment.  *See*
Defs.' SOF No. 4 (Docket No. 31) (citing AR 387).  As part of that process, the BLM deemed it
necessary to evaluate conditions on the ground by conducting a rangeland health assessment at
representative areas, specifically five "assessment polygons" within the Allotment ranging in
size from 31,000 acres to 54,000 acres.  *See id.*  The BLM then gathered an interdisciplinary
team of resource specialists to complete the rangeland health assessment and field work.  *See id.*
at SOF No. 4 (citing AR 450, 1063).

8.      On April 25, 2011, the BLM sent a notice to all permittees and interested
members of the public (including WWP), inviting them to participate in the field assessment for
the Allotment.  *See id.* at SOF No. 5 (citing AR 1062); *see also* Intervenor's SOF No. 1 (Docket
No. 35, Att. 1) (citing AR same).  Several permittees participated in the assessment; however, no
interested members of the public (including WWP) participated.  *See* Defs.' SOF No. 5 (citing
AR 387); *see also* Intervenor's SOF No. 1 (Docket No. 35, Att. 1) (citing AR 1-483).

9.      After the BLM's interdisciplinary team completed field work in July 2011, it
prepared an Allotment Assessment summarizing the BLM's findings.  *See* Defs.' SOF No. 6
(citing AR 1063-76); *see also* Intervenor's SOF No. 3 (Docket no. 35, Att. 1) (citing AR 469-
82).  The Allotment Assessment contained explanations of how conditions on the Allotment
related to the existing Idaho Standards for Rangeland Health and Guidelines for Livestock
Grazing Management, explaining the rate of departure of key indicators of resource health from
expected conditions.  *See* Defs.' SOF No. 7 (citing AR 1065-76); *see also* Pl.'s SOF No. 29
(Docket No. 23) (citing AR 462, 469).  Four of the eight Rangeland Health Standards applied to

**MEMORANDUM DECISION AND ORDER AND ORDER - 6**

the Allotment: Standard 1 (Watersheds), Standard 4 (Native Plant Communities), Standard 5

(Seedings), and Standard 8 (Threatened and Endangered Plants and Animals). *See* Defs.' SOF

No. 7 (Docket No. 31) (citing AR 1066-76); Pl.'s SOF No. 29 (Docket No. 23) (citing Compl.,

¶ 90 (Docket No. 1); AR 463).[5]  As to each of these four Standards, the Allotment Assessment

revealed the following:

        a.      Standard 1 (Watersheds): The Allotment Assessment noted slight to

moderate departure of indicators from expected conditions, and in every case attributed the

departure to wildfire. *See* Defs.' SOF No. 7 (Docket No. 31) (citing AR 1066-67).

        b.      Standard 4 (Native Plant Communities): The Allotment Assessment

revealed departure from expected conditions in the form of reduced presence of shrubs, increase

in cheatgrass, and a general change in plant community. *See id.* at SOF No. 7 (citing AR 1067-

70).  As with Standard 1, the Allotment Assessment explained that wildfire was the major driver

of the sub-prime conditions. *See id.* at SOF No. 7 (citing AR 1069).

        c.      Standard 5 (Seedings): The Allotment Assessment determined that the

indicators for "biotic integrity" in the four assessment areas were rated as none to slight

departure from site potential, except for functional/structural groups (slight to moderate

departure for one assessment area, moderate departure for three assessment areas) and invasive

plants indicators (none to slight department for two assessment areas, moderate departure for two

assessment areas). *See* AR 1071.  Additionally, previously-uncollected vegetative cover studies

were conducted in non-native seedings within the Allotment. *See id.*

---

    [5]  Because the Allotment contains no riparian areas, streams, or springs, the Allotment
Assessment noted that Rangeland Health Standard 2 (Riparian Areas and Wetlands), Standard 3
(Stream Channel/Floodplain), and Standard 7 (Native Plant Communities) did not apply. *See*
Defs.' SOF No. 7 (Docket No. 31) (citing AR 1067, 1072).

**MEMORANDUM DECISION AND ORDER AND ORDER - 7**

      d.      Standard 8 (Threatened and Endangered Plants and Animals): The Allotment Assessment described reduced shrubs and presence of cheatgrass as potential concerns.  *See* Defs.' SOF No. 7 (Docket No. 31) (citing AR 1072-76).

      10.      On November 17, 2011, the BLM sent a cover letter, along with the Allotment Assessment to all permittees and interested members of the public.  *See id.* at SOF No. 8 (citing AR 1077); *see also* Intervenor's SOF No. 3 (Docket No. 35, Att. 1) (citing AR same).  As with its April 25, 2011 letter, the BLM designed the letter to encourage public involvement and to solicit key issues which were important to the public.  *See id.*  The cover letter explained that the Allotment Assessment was part of the permit renewal process, allowing the public to review it, and requesting additional Allotment-specific data by December 9, 2011 for the BLM's consideration in the forthcoming Allotment evaluation(s).  *See id.*  According to Interior and Intervenors, WWP did not contact the BLM regarding the Allotment Assessment, nor did WWP provide additional Allotment-specific data as requested.  *See* Defs.' SOF No. 8 (citing AR 387); *see also* Intervenor's SOF No. 3 (Docket No. 35, Att. 1) (citing AR 1-483).  WWP disagrees, claiming that "[a] WWP staff member submitted a declaration describing that she did provide comments on BLM's [A]llotment [A]ssessment."  Pl.'s Obj. to Defs.' SOF No. 8 (Docket No. 40) (citing AR 22890-902, 1783-84, 1806-11); *see also* Pl.'s Obj. to Intervenor's SOF No. 3 (Docket No. 41) (citing same).[6]

---

    [6]  The Second Declaration of Katie Fite states in relevant part that she "provided comments to BLM and included proposed alternative actions for the Big Desert allotment assessment," referencing a "May 29, 2012 Letter to BLM Idaho Falls FO Manager."  6/5/14 Second Decl. of Katie Fite, p. 4 (AR 1809).  Ms. Fite goes on to state:

        BLM's claims that WWP did not participate at that point are not correct, and appear to be a smokescreen aimed at trying to cover up the gross deficiencies of the FRH

11.      On December 12, 2011, the BLM's interdisciplinary team prepared an Evaluation Report in an effort to determine whether the Allotment was achieving the Idaho Standards for Rangeland Health and Guidelines for Livestock Grazing Management.  *See* Defs.' SOF No. 9 (Docket No. 31) (citing AR 387, 1078-84).  The Evaluation Report included BLM's findings as to whether the Allotment was either "Meeting the Standard," "Not meeting the Standard but making significant progress toward meeting," or "Not meeting the Standard."  *See id.* at SOF No. 9 (citing AR 1078-84).  As to each of four above-referenced Standards, the Evaluation Report noted the following:

a.      Standard 1 (Watersheds): The Evaluation Report indicated that "recent fire activity in the areas has removed a large majority of the shrub composition, as well as reduced the large bunchgrass competition" but, even so, "[t]he large majority of the [Allotment] provides for proper infiltration, retention, and release of water appropriate to soil type, vegetation, climate, and landform to provide for proper nutrient cycling, hydrologic cycling, and energy flow."  *See* Defs.' SOF No. 10 (Docket No. 31) (quoting AR 1080).  Ultimately, it was concluded that the  Allotment was "Meeting the Standard."  *See id.*

_____

process and EA in sacrificing sage-grouse habitats and populations to the livestock industry.  I am very concerned to see that BLM claims that WWP had not commented.

. . . .

In these comments on the deficiencies of the Big Desert assessment, I raised the very issues that BLM now claims were never raised – just as WWP has previously raised these same issues in the context of all the other BLM processes affecting the Big Desert landscape and its declining sage-grouse and other sensitive species populations.  It is also my experience that it is not necessary in OHA proceedings to have commented, or protested, a BLM action prior to Appealing.

*Id.* at p. 5 (AR 1810).

**MEMORANDUM DECISION AND ORDER AND ORDER - 9**

b.      Standard 4 (Native Plant Communities): The Evaluation Report contains

findings that "[t]he large majority of the Native Plant Communities in the [Allotment] is not

meeting the standard, but is making significant progress toward meeting."  AR 1081, 1083; *see*

*also* Defs.' SOF No. 11 (Docket No. 31) (citing same).  Indeed, according to the Evaluation

Report, "[t]he repeated disturbance associated with wildfires in the [A]llotment has contributed

to the decrease in large bunchgrass composition in the areas and increase in cheatgrass

composition," but that "[t]he shrub component will continue to reestablish in the [A]llotment as

long as the [A]llotment isn't affect by future fires."  AR 1081.  Despite this reduction in shrub

component, the Evaluation Report includes a conclusion that "the grass and forb components are

productive and healthy within the [Allotment]."  *Id*.

c.      Standard 5 (Seedings): As the BLM's finding that the Allotment was

"Meeting the Standard," the Evaluation Report contains comments that it (1) "meets the

Standard to maintain life form diversity, production, native animal habitat, nutrient cycling,

energy flow, and the hydrologic cycle"; and (2) "[t]he seedings remain productive and provide

adequate litter and residual plant material for site protection."  AR 1082; *see also* Defs.' SOF

No. 10 (Docket No. 31) (citing same).

d.      Standard 8 (Threatened and Endangered Plant and Animals): Consistent

with Standard 4, breeding habitat for sage grouse was evaluated, with the Evaluation report

finding  "an unsuitable habitat rating overall for sage grouse" resulting from "greatly reduced

sagebrush cover and heights, and slightly reduced tall bunchgrass densities and heights, and

increased composition of annual grasses (cheatgrass) – each a result of past wildfires.  AR 1083;

*see also* Defs.' SOF No. 11 (Docket No. 31) (citing same).  Still, as with Standard 4, the

**MEMORANDUM DECISION AND ORDER AND ORDER - 10**

Evaluation Report also said that, despite the reduction in shrub component, "the large majority of

the grass and forb components are productive and healthy within the [Allotment]."  *Id.*

Ultimately, the Evaluation Report contained a conclusion that the Allotment was "[n]ot meeting

the Standard, but making significant progress towards meeting."  *Id.*

12.     After completing the Evaluation Report and finding that the Allotment was either

meeting certain Standards or, if not, making significant progress towards meeting other

applicable Standards (*see supra*), the BLM's interdisciplinary team assembled a draft set of

alternatives ("Draft Alternatives") for NEPA evaluation.  *See* Defs.' SOF No. 12 (Docket No. 12

(Docket No. 31) (citing AR 1085-87).  There were four Draft Alternatives identified, including

(1) no action (Alternative A); (2) a slight modification of the season of use with additional

flexibility, as proposed by the permittees (Alternative B); (3) a slight modification and extension

of the season and the creation of a forage reserve (Alternative C); and (4) no grazing (Alternative

D).  *See id.*

13.     On December 14, 2011, the BLM circulated the Evaluation Report and Draft

Alternatives to all permittees and interested members of the public, including WWP.  *See id.* at

SOF No. 13 (citing AR 1088); *see also* Intervenor's SOF No. 4 (Docket No. 35, Att. 1) (citing

AR 1088, 1085-87).  As with its April 25 and November 17, 2011 letters, the December 14, 2011

letter invited the public to comment on these documents by January 9, 2012, this time to ensure

that the BLM had accurately evaluated resource conditions and had a good range of alternatives

to consider on the Allotment.  *See id.*  Again, Interior and Intervenors claim that WWP did not

respond to, or otherwise contact, the BLM about the Evaluation Report or the Draft Alternatives.

*See* Defs.' SOF No. 13 (citing AR 387); *see also* Intervenor's SOF No. 4 (Docket No. 35, Att. 1)

**MEMORANDUM DECISION AND ORDER AND ORDER - 11**

(citing AR 1-483).  And, as before, WWP disagrees, claiming that "[a] WWP staff member

submitted a declaration describing that she did provide comments on BLM's Allotment

Assessment and conformance document."  Pl.'s Obj. to Defs.' SOF No. 13 (Docket No. 40)

(citing AR 22890-902, 1783-84, 1806-11).[7]

## C.  The BLM's Environmental Assessment:  Grazing Permit Renewal for Big Desert Sheep Allotment

14.    After reviewing data and public feedback regarding the Evaluation Report and

Draft Alternatives, the BLM completed an EA in December 2012.  *See* Defs.' SOF No. 14

(Docket No. 31) (citing AR 380-461); *see also* Intervenor's SOF No. 5 (Docket No. 35, Att. 1)

(citing same).  According to Interior, because no permittee or interested member of the public

expressed disagreement with the BLM's Allotment Assessment, Evaluation Report, or Draft

Alternatives, the BLM analyzed in detail the four alternatives that it had previously disclosed to

the public.  *See* Defs.' SOF No. 14 (Docket No. 31); *see also* Intervenor's SOF No. 5 (Docket

No. 35, Att. 1) (citing AR 1-483).

---

[7]  These citations relate to the same ones WWP cited in response to Interior's SOF No. 8, discussed *supra*.  In this respect, it should be pointed out that WWP claims to have submitted a May 29, 2012 letter to the BLM, containing "comments on the BLM's allotment assessment and conformance document for the sprawling Big Desert Sheep."  *See* AR 22890-902.  In general, these comments reflected a sharp critique of the BLM's Allotment Assessment.  *See, e.g.*, AR 22890 ("BLM has also not provided a full and detailed honest analysis of the cause of any shortcomings/failures to meet standards.  Tremendous impacts of domestic sheep to wildlife habitat and populations, native vegetation (including rare plants) and their habitat and population, recreation, wilderness values, and aesthetic values, cultural values, and other important values of the public lands are ignored, downplayed, and minimized.").  However, the BLM says it never received this letter.  *See*  6/30/14 Decl. of Jeremy Casterson, ¶¶ 5-9 (AR 1879-80) ("Having reviewed paper and electronic correspondence files, I can confidently state that BLM's Upper Snake Field Office never received WWP's May 29, 2012 letter regarding the Big Desert Sheep Allotment.  This is consistent with the Big Desert Sheep permit renewal EA where BLM did not identify WWP as a participant in the permit renewal process.").  WWP admits that it does not have proof that the BLM ever received its May 29, 2012 letter.  *See* Pl.'s Resp./Reply, p. 4 (Docket No. 37).

**MEMORANDUM DECISION AND ORDER AND ORDER - 12**

a.      The BLM's EA noted that naturally-occurring wildfire explained why conditions were not perfect on the Allotment.  *See* Defs.' SOF NO. 15 (citing AR 410).  The EA also explained that grass and forb components had largely recovered post-fire and provided "productive and healthy habitat" for certain wildlife.  *See id.* at SOF No. 15 (citing AR 410, 437).  Furthermore, the EA explained that shrubs and sagebrush were naturally coming back to the Allotment, thus allowing for the Allotment to make significant progress toward meeting Standards.  *See id.* at SOF No. 15 (citing AR 425, 428-29).  The BLM also described its non-grazing, active restoration efforts to plant and seed sagebrush on the Allotment.  *See id.* at SOF No. 15 (citing AR 428).

b.      The BLM's EA examined how the Draft Alternatives would impact key resources on the Allotment.  *See id.* at SOF No. 16 (citing AR 402-05, 407-08, 425-35).

i.      Interior suggests that, "[b]ecause the BLM's field work showed that current grazing management was not causing resource damage on the Allotment, it was not surprising that the BLM's analysis showed that continuation of current management with slight tweaks to the grazing season would allow the Allotment to continue making significant progress toward meeting Standard 4 (Native Plant Communities) and Standard 8 (Threatened and Endangered Plant and Animals).  *Id.* at SOF No. 16 (citing AR 421-24, 429-31).  WWP disagrees that with any characterization of the changes to the grazing season in the BLM's final decisions (40 days, including 25 during the critical sage-grouse breeding and nesting season) as "slight tweaks."  *See* Pl.'s Obj. to Defs.' SOF No. 16 (Docket No. 40) (citing AR 989, 992, 1020, 14814-15, 14822).

ii.      The BLM explained how the forage reserve incorporated into Alternative C would allow the BLM to increase sagebrush in a crested wheatgrass seeding, while

**MEMORANDUM DECISION AND ORDER AND ORDER - 13**

providing a place where permittees in the area could graze livestock in emergency situations. *See* Defs.' SOF No. 17 (Docket No. 31) (citing AR 392-93, 420-22, 430-32).  WWP disputes that increased grazing will increase sagebrush "because sheep eat sagebrush and grazing damages sagebrush."  Pl.'s Obj. to Defs.' SOF No. 17 (Docket No. 40) (citing Pl.'s SOF No. 18 (Docket No. 23); AR 23243-50, 22756, 22766, 22805-07, 22814-16, 23967-71).  In short, WWP contends that the BLM's primary motivation for constructing the forage reserve was to promote livestock grazing.  *See* Pl.'s Obj. to Defs.' SOF No. 17 (Docket No. 40) (citing AR 23522).

iii.     The BLM also considered the new infrastructure that would be built to accommodate the forage reserve – 14 miles of new boundary fence (including fence posts), three miles of new pasture fence (including fence posts), a well, water delivery devices, a corral, and other smaller projects.  *See* Defs.' SOF No. 18 (Docket No. 31) (citing AR 393-94). In addition to noting the EA's recognition that forage reserves could align with various conservation plans/strategies relative to sage-grouse populations, Interior claims that, "[b]ecause [the forage reserve] would be built in restoration sage-grouse habitat, the BLM carefully analyzed the impacts of the new infrastructure on sage-grouse and weighed it against the benefits of the reserve to sage-grouse and other resources."  *Id*. at SOF No. 18 (citing AR 415-18, 421, 1346, 1348, 1351, 1363, 1404, 1542-43, 1546, 1132-39); *see also* AR 421-22 (EA concluding that "[p]otential impacts to sage-grouse are minimal due to the lack of suitable sage-grouse habitat and distance to occupied leks.  Fence posts would provide perches for predators of sage-grouse nests and chicks but the distance to suitable sage-grouse habitat diminishes the potential for predators to be successful from fence posts.").  WWP counters that the forage reserve and associated infrastructure would be built in PPH-designated areas – the most important sage-

**MEMORANDUM DECISION AND ORDER AND ORDER - 14**

grouse habitat type.  *See* Pl.'s Obj. to Defs.' SOF No. 18 (Docket No. 40) (citing AR 997, 1132, 22690).

**D.    The BLM's Proposed Decisions for the Big Desert Sheep Allotment, Finding of No Significant Impact, and WWP's Protest**

15.    In early December 2012, after completing the EA, the BLM prepared proposed decisions for the Allotment, ultimately proposing the selection of Alternative C (a modification and extension of the grazing season and the creation of a forage reserve).  *See* Defs.' SOF No. 19 (Docket No. 31) (citing AR 244-352).  The rationale for the election of Alternative C included:

> This decision is based on the findings of the interdisciplinary team on the available monitoring data, allotment evaluation, consultation, and [the EA].  Implementation of the actions described above, including the permit terms and conditions, will help ensure that the allotment continues to meet or make significant progress toward meeting all applicable standards within the allotment.
>
> The decision for the Big Desert Sheep Allotment is in conformance with the Greater Sage-Grouse Interim Management Policies and Procedures Instruction Memorandum (IM-2012-043).
>
> The rangeland health assessment indicates that Alternative C would also continue to meet Standards 1 and 5, and continue to make significant progress toward meeting Standards 4 and 8 at a similar rate as Alternative B.  Use of the Big Desert Sheep Allotment would be similar to Alternative B, except for the creation of the Countyline Forage Reserve Allotment.  The establishment of the Countyline Forage Reserve Allotment would include authorizing the construction of a boundary/pasture fence, the construction of a pipeline with three trough sets and two wildlife guzzlers, the drilling of a well, the placement of a storage tank, corral, and the placement of one cattleguard in the forage reserve allotment.  Both the Sage Grouse Comprehensive Conservation Strategy (2006) and the Big Desert Sage-Grouse Planning Areas Conservation Planning Areas Conservation Plan (2010) suggest pursuing opportunities for forage reserves to accommodate livestock operators during implementation of rehabilitation and restoration activities.  Currently, there are no alternative forage reserves identified in the Big Desert during natural recovery of untreated areas, or during rehabilitation and restoration establishment/rest periods for treated sites.  These measures would facilitate resource objectives such as providing rest to improve herbaceous cover in certain nesting and brood-rearing areas.  Another potential benefit of a forage reserve would be to reduce fuel loads

where forage is being under-utilized, in turn reducing the frequency of wildfire and cause sagebrush to reestablish sooner onsite.

Seventeen miles of fences would be installed to establish the forage reserve. Fencing would be within the crested wheatgrass seedings. The proposed projects are all in conformance with IM 2012-043 (Greater Sage-Grouse Interim Management Policies and Procedures). A primary objective of the fence is to benefit greater sage-grouse habitat by increasing sagebrush cover in crested wheatgrass seeding. The fence will [be] no closer than 1.75 miles from the closest known lek and reflectors will be installed to improve fence visibility to sage-grouse. Approximately 2,800 acres of the proposed forage reserve was homesteaded and farmed in the past, the forage reserve has been seeded into crested wheatgrass multiple times (1952 and 1971). Currently, over 80% of the proposed forage reserve is dominated by crested wheatgrass. The nearest occupied lek is greater than 1.75 miles from the proposed fence. Increased soil surface disturbance and compaction would be expected in a narrow area adjacent to the new fence, as livestock commonly trail along fences more intensively. The portion of the proposed fence located within 2 miles of an active lek would be made more visible by adding reflectors, if subsequent observations determine that sage-grouse are striking the new fence in other locations, the fence would be modified to make it more visible by adding reflectors. The addition of three troughs and wildlife guzzlers would provide a water source for migratory birds and wildlife throughout the spring, summer, and fall. Grazing use in the allotment would only be authorized on a temporary basis to existing BLM operators whose permitted use has been suspended due to fire, vegetation rehabilitation projects, or other causes. The season of use in the allotment would be 4/1-12/30. The expanded season of use in the allotment would give the BLM the flexibility to determine the most appropriate time to graze. Grazing will be used as a tool to improve sage-grouse habitat. Increasing sagebrush would be the primary consideration in determining the authorized annual season of use and amount of use. Permitted AUMs in the new allotment would be 1,300. The AUMs needed to establish the forage reserve would be removed from the AUMs allocated in the Big Desert Sheep Allotment under the MFP.

The area that would be set aside for the forage reserve has been seeded into crested wheatgrass multiple times (1952 and 1971). By allowing both livestock species to graze within the forage reserve, the diversity of the plant community has potential to increase. The difference in food selection between the two species could reduce the competitive advantage of the crested wheatgrass, which dominates the area. The area of the proposed forage reserve is in priority sage grouse habitat the currently lacks sagebrush plants. Without taking some kind of action the crested wheatgrass seeding will continue to have an absence of sagebrush cover. Sagebrush cover would increase in the forage reserve considerably more in Alterative C than the other alternatives. Pellant and Lysne (2006) show that livestock grazing can facilitate an increase in the diversification of crested wheatgrass or similar seedings. Another

**MEMORANDUM DECISION AND ORDER AND ORDER - 16**

benefit of livestock use at the appropriate time and intensity in crested wheatgrass seedings is to facilitate the return of sagebrush.  Sagebrush cover in seedings is less under light to moderate spring livestock use, but increases under higher crested wheatgrass utilization levels for the same period of time (Frischknecht and Harris, 1968).  The creation of the forage reserve would have a potential long term positive impact to the permittees in the USFO.  Permittees in the field office that have been impacted by short term allotment closures, such as fire/non-fire vegetation treatments, wildfire recovery, or an opportunity to provide for a more rapid attainment of Idaho Standards for Rangeland Health in particular allotments or pastures, would have an opportunity to continue grazing on public land instead of reducing their herds or purchasing forage.  The potential economic impact on operators authorized to use the forage reserve on a temporary basis would be a savings of between $14,625 and $128,245 when comparing the AUM cost for grazing public versus forage cost associated with private pasture or purchase of forage. The construction of boundary/pastures fences, well, pipeline, corral, wildlife guzzlers, and trough sets under Alternative C would result in additional cost incurred by the USFO in order to implement the forage reserve.  Impacts to sage-grouse would be minimal due to the bedding area restrictions around leks and anti-collision reflectors being installed on new fence construction.

AR 275-77.

16.     The BLM concluded that the EA and proposed decisions would not have a significant impact on the environment and, on December 3, 2012, sent the EA, the proposed decisions, and the FONSI to all permittees and interested public, including WWP.  *See* Defs.' SOF No. 19 (Docket No. 31) (citing AR 1141 (FONSI), 244-379 (EA and proposed decisions)); *see also* Intervenor's SOF NO. 6 (Docket No. 35, Att. 1) (citing AR 1089-97).

17.     On December 18, 2012, WWP submitted a protest to BLM's proposed decisions for the Allotment.  *See* Defs.' SOF No. 20 (Docket No. 31) (citing AR 1098-120); *see also* Intervenor's SOF No. 7 (Docket No. 35, Att. 1) (citing AR 221-43).  Interior claims that, "[a]side from a few references to the Allotment in the first couple pages, the majority of the protest complained about broad BLM policies or conditions, or action on *other* allotments that do not even apply to the Allotment at hand."  Defs.' SOF No. 20 (Docket No. 31) (emphasis added); *see*

**MEMORANDUM DECISION AND ORDER AND ORDER - 17**

*also* Defs.' Opp./Mem. in Supp., p. 8 (Docket No. 30, Att. 1) ("In sum, it was a mostly generic, cut-and-paste document.").

18.     For the first time, WWP's protest criticized the BLM's Draft Alternatives, demanding that the BLM ban grazing and that the area be turned into a "reference study area" and "used for carbon sequestration, including intact and functioning microbiotic crusts, and ungrazed and healthy native plant communities." *See* Defs.' SOF No. 21 (Docket No. 31) (quoting AR 1098).  WWP also complained that the BLM needed to prepare an environmental impact statement ("EIS") to better consider WWP's new "reference study area" proposal, the "full effects of grazing disturbances," and how "the effects of this operation are . . . destroying biodiversity and promoting global warming." *See id.*[8]  Finally WWP noted its opposition to the infrastructure associated with Alternative C's contemplated forage reserve, explaining that it was inconsistent with sage-grouse conservation. *See id.* at SOF No. 21 (citing AR 1100).[9]

---

[8] Interior claims that this was the first time WWP made such a complaint. *See* Defs.' SOF No. 21 (Docket No. 31); *see also* Intervenor's SOF No. 7 (Docket No. 35, Att. 1). However, it should be pointed out that WWP's May 29, 2012 letter (discussed *supra*) talked about the need for an EIS "that examines all direct, indirect and cumulative adverse impacts of livestock grazing in the Big Desert sheep allotment," including the "benefits of passive restoration (allowing ecosystem components to heal through removal of disturbance and degrading activities) . . . ." AR 22896; *see also* Pl.'s Obj. to Defs.' SOF No. 20 (Docket No. 40) (citing AR 22890-902, 1783-84, 1806-11); Pl.'s Obj. to Intervenor's SOF No. 7 (Docket No. 41) (citing same).

[9] Interior claims that much of the balance of WWP's protest had nothing to do with the Allotment. *See* Defs.' SOF No. 22 (Docket No. 31).  In particular, Interior argues:

> For instance, WWP protested BLM's failure to consider the impacts of a number of facilities and/or actions.  However, many of the facilities and/or action such as powerlines, aquifer depletion, losses of springs and seeps, chainings, siting of energy projects, mines or mining, etc. do not occur in the Allotment.  Similarly, WWP included several pages complaining of BLM's failure to protect streams, springs, and wet meadow areas.  This makes no sense because there are no such riparian or stream areas within the Allotment.  Nevertheless, WWP is critical of "BLM's own data and photographs" regarding riparian areas, BLM's proposal to "develop and irreversibly

**MEMORANDUM DECISION AND ORDER AND ORDER - 18**

**E.      The BLM's Final Decisions for the Big Desert Sheep Allotment**

19.      After considering WWP's protest, the BLM reconsidered the EA.  Then, on February 6, 2013, final decisions were issued to the 15 separate permittees.  *See* Defs.' SOF No. 23 (Docket No. 31) (citing AR 43-208); *see also* Intervenor's SOF No. 8 (Docket No. 35, Att. 1) (citing AR 43-53).  As in the proposed decisions, the BLM's final decisions selected Alternative C.  *See* Defs.' SOF No. 23 (citing, *e.g.*, AR 69).  Each final decision specifically relied on the findings outlined in the EA, explaining that implementation of Alternative C would allow the Allotment to continue to meet or make significant progress toward meeting Standards 1, 4, 5, and 8.  *See id*. at SOF No. 23 (citing, *e.g.*, AR 72); *compare with* AR 275-77 (identical rationale for proposed decisions).  The final decisions also explained why the BLM wanted to create the new forage reserve and why the new infrastructure associated with the forage reserve was consistent with conservation plans/strategies relative to sage-grouse populations.  *See* Defs.' SOF No. 23 (Docket No. 31) (citing, *e.g.*, AR 72-73).

20.      Moreover, the final decisions addressed some of the concerns raised in WWP's protest.  *See id*. at SOF No. 24 (citing, *e.g.*, AR 65-68).  For example, the BLM said that WWP had failed to participate in the permit renewal process at key moments, and raised issues (like

---

alter even more fragile springs," and urges BLM to examine "intermittent and ephemeral drainages."  There are no springs on the Allotment, BLM is not proposing to develop the non-existent springs, and BLM has no "data" or "photographs" regarding riparian areas.

Defs.' SOF No. 22 (Docket No. 31) (internal citations omitted); *see also* Intervenor's SOF No. 7 (Docket No. 35, Att. 1) (citing AR 222, 224, 43-53).  WWP does not respond/dispute Interior's/Intervenor's arguments in these respects.  *See generally* Pl.'s Obj. to Defs.' SOF (Docket No. 40); Pl.'s Obj. to Intervenor's SOF (Docket No. 41).

**MEMORANDUM DECISION AND ORDER AND ORDER - 19**

riparian problems) that did not even apply to the Allotment.  *See id*. at SOF No. 24 (citing, *e.g.*, AR 66-68); *see also supra* (discussing WWP's May 29, 2012 letter).

**F.      WWP Appeals the BLM's Final Decisions for the Big Desert Sheep Allotment**

21.      On or around March 8, 2013, WWP appealed and petitioned for a stay of all 15 final grazing decisions for the Allotment to the OHA.  *See* Defs.' SOF No. 25 (Docket No. 31) (citing AR 484-86); *see also* Intervenor's SOF No. 9 (Docket No. 35, Att. 1) (citing AR 4-42). According to Intervenors, WWP did not serve its appeal to Etcheverry Sheep Company or other persons named in the final grazing decisions.  *See* Intervenor's SOF No. 10 (Docket No. 35, Att. 1) (citing AR 4-42).

22.      On March 31, 2014, WWP filed with OHA its motion for summary judgment, arguing that (1) the BLM was required to prepare an EIS; (2) the BLM failed to take a "hard look" at the final decisions' effects on greater sage-grouse and sagebrush habitat; (3) the final decisions are inconsistent with the governing land use plans and the BLM's policies on sage-grouse and sensitive species; (4) the EA did not consider several reasonable alternatives; (5) the EA failed to consider impacts to the objects of the Craters of the Moon National Monument and important wilderness values; (6) the EA and FONSI were invalid because the BLM failed to provide a determination for its Rangeland Health Analysis; and (7) the cumulative impacts analysis is flawed.  *See* Defs.' SOF No. 26 (citing AR 836-918).

23.      On May 19, 2014, the BLM filed a cross-motion for summary judgment.  *See id.* at SOF No. 26 (citing AR 925-74).

24.      On July 10, 2014, OHA issued an Order and Summary Decision denying WWP's motion for summary judgment, granting the BLM's cross-motion for summary judgment, and

**MEMORANDUM DECISION AND ORDER AND ORDER - 20**

affirming the BLM's 15 final grazing decisions.  *See id.* at SOF No. 27 (citing AR 2017-44); *see also* Intervenor's SOF No. 12 (Docket No. 35, Att. 1) (citing same).  The OHA rejected each of WWP's above-referenced arguments, concluding (in a sometimes overlapping manner) the following:

      a.    <u>Requirement for EIS</u>:

With respect to NEPA . . ., WWP alleges that BLM's Final Decisions violate the statute by failing to take a 'hard look' at environmental alternatives, including moving the new forage reserve further to the west,[10] and by failing to adequately analyze the cumulative impacts of the proposed actions.  However, the record is clear that there are no kipukas actually located on the allotment itself.  In my opinion, therefore, Appellant has not met the requisite burden of proof to demonstrate that BLM's decisions were without any reasonable basis with respect to alleged grazing damage to kipukas.  With respect to the potential requirement for a full EIS, BLM adopted appropriate mitigation measures, which insure that the instant decisions do not implicate "significant" impacts necessary to warrant a full EIS.  In turn, the Council on Environmental Quality ("CEQ") regulations implementing NEPA define an EA as a concise document that serves to "briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact."  An EA ". . . shall include brief discussions of the need for the proposal, of alternatives as required by section 102(2)(E), of environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted."  The administrative record is clear that the BLM made every effort to consult with WWP and other interested publics during its pre-decisional proceedings.  BLM complied with each of the aforementioned regulatory requirements, including consultations with interested publics who chose to participate in the pre-decisional proceedings.

The requirements for the contents of an EA are also delineated in the Department's NEPA regulations . . . .  For the Appellant to prevail on

---

     [10]  The ALJ issuing the OHA's Order and Summary Decision misspoke (here and elsewhere) in this respect: WWP recommended that the forage reserve be located further *east*, not west.  *See infra*.

**MEMORANDUM DECISION AND ORDER AND ORDER - 21**

its Motion for Summary Judgment, there must be a glaring error of fact, a failure to consider a substantial environmental question of material significance, or a clear legal inadequacy in the EA.  In my opinion, WWP has not met this burden of proof.

AR 2035 (internal citations omitted).

      b.    <u>"Hard Look" at Sage-Grouse and Sagebrush Habitat</u>

With respect to whether or not BLM took the requisite "hard look" at sage-grouse habitat and related resource issues, BLM's monitoring data serves as a reasonable basis to support both the EA and the accompanying FONSI.  BLM's analyses in the EA . . . include reviews of pertinent resources, sensitive wildlife species, especially the sage-grouse, sage-grouse habitat, invasive weeds, cultural resources, and vegetation resources.  The scope of these analyses are in consonance with the above-referenced precedents pertaining to "brief" analyses of pertinent environmental issues required for a legally sufficient EA.  Indeed, the EA does address historic wildfires and concludes that wildfires have caused historic problems on the allotment but that grazing is not largely responsible for such problems, because grazing, in fact, has been historically relatively light on the allotment.  In large part, because of historic wildfires, the allotment is not currently suitable sage-grouse habitat, because of the reduction in sagebrush over a lengthy period of time.  In this context, the EA frankly recognizes historic, declining sage-grouse populations on the allotment.  Relatedly, BLM took the appropriate "hard look" at how the new fences and watering facilities would impact sage-grouse and other wildlife resources by properly analyzing the impacts of the forage reserve and its new infrastructure.  Also, BLM correctly concluded that moving the forage reserve further to the west as recommended by WWP would not be sufficiently different from the selected alternative C, the proposed action, to warrant further analysis.  Consequently, the decision maker made informed decisions, as required by NEPA.  The Final Decisions disallow grazing around all leks, active and inactive, and, consequently, the permitted grazing is not, as contended by WWP, necessarily incompatible with the protection of sage-grouse.

WWP criticizes BLM for classifying the Big Desert Sheep Allotment as essentially unsuitable for sage-grouse nesting.  However, sage-grouse nesting suitability requires some 15% or more of overall sagebrush cover, and the Big Desert Sheep Allotment has less than 15% sagebrush cover.  Suitable nesting and early brood-rearing

**MEMORANDUM DECISION AND ORDER AND ORDER - 22**

habitats require sagebrush with a healthy herbaceous understory and 15-25% canopy cover of sagebrush, which is significantly lacking on the Big Desert Sheep Allotment.  However, BLM did recognize that there was a potential for some grazing impacts upon sage-grouse through reduction of understory grass and forb height and cover. NEPA is a procedural statute, and it is clear that the agency took a hard look at potential grazing impacts upon sage-grouse, and, consequently, that the decision-maker made informed final decisions.

. . . .

With respect to the proposed range improvements on the new forage reserve, the EA analyzes the referenced fence and water projects with respect to potential impacts upon sage-grouse.  BLM insured that the new forage reserve and its associated fences are more than 1.75 miles from the nearest occupied lek.  Further, BLM committed to mark fences within two miles of an active lek with reflectors.  In my opinion, the EA takes the requisite hard look at the likely impacts of the proposed range improvements on the different resource values analyzed, including sensitive wildlife species, such as, the sage-grouse.  With respect to the new forage reserve, the BLM archeologist and range management specialist effectuated an alteration in the location of the then-proposed fence and pipeline, so as to avoid ground disturbing impacts to historic properties.

AR 2035-37 (internal citations omitted).

c.      Land Use Plans, BLM Policies, and Rangeland Health

BLM defends its new forage reserve by noting that it is consistent with the Idaho Sage-Grouse Conservation Plan.  In particular, it is the historic lack of sagebrush cover that is the main habitat problem for sage-grouse on the allotment, and, further, BLM has demonstrated that it is likely that the new forage reserve will actually improve conditions for sage-grouse, because it is a reserve.

. . . .

WWP further alleges that BLM violated FLPMA, as well as the pertinent land use plans, alleging that the Final Decisions fail to minimize sheep grazing impacts upon sage-grouse habitat, sagebrush, and related vegetative resources on the allotment.  However, BLM's analyses in the Final EA confirm that sheep grazing on the allotment is in accord with the pertinent land use plans, and that the allotment

**MEMORANDUM DECISION AND ORDER AND ORDER - 23**

will continue to either meet or make significant progress in meeting applicable standards for rangeland health. Relatedly, the permitted sheep are grazed in a controlled and targeted fashion by both sheep herders and dogs, and BLM requires herders to avoid lekking areas during the lekking season. Consequently, multiple-use objectives under the auspices of FLPMA are properly preserved under the purview of BLM's decisions on appeal. Indeed, the remedial action-related requirements of 43 C.F.R. 4180.2(c) are not triggered in this case, because BLM determined that the allotment is already making significant progress toward meeting relevant rangeland standards.

With respect to WWP's contention that BLM's grazing decisions violate the relevant land use plans, because they do not include active restoration of sagebrush habitat, such as, provisions for planting sagebrush or removing crested wheatgrass, BLM's Sur-Reply Brief makes a telling point that such restoration activities are not exclusively implemented through the auspices of grazing permits. In particular, BLM notes that ". . . BLM does not just manage resources through grazing decisions, and the agency is fully capable of conducting restoration activities outside of the grazing permit renewal process." In particular, BLM has been conducting restoration activities in the Craters of the Moon and Big Desert Sheep areas that are generally in accord with the restoration recommendations of WWP.

Consequently, with respect to its overall NEPA and FLPMA allegations, WWP has provided inadequate allotment-specific evidence to carry its burden of proof so as to effectively challenge the Final Decisions, based upon the requisite preponderance of the evidence test.

AR 2037, 2039 (internal citations omitted).

d.    Reasonable Alternatives

WWP contends that BLM failed in the Final EA to analyze a reasonable range of alternatives, including potentially moving the new forage reserve further to the west of the allotment. NEPA requires that an EA, as distinguished from a full EIS, include ". . . brief discussions of the need for the proposal, of alternatives . . . of the environmental impacts of the proposed action and alternatives." Agencies are only required to evaluate "all reasonable alternatives," and with respect to eliminated alternatives to briefly discuss the reasons for elimination. Long-standing judicial precedent makes clear that the range of alternatives analyzed by the agency need not

**MEMORANDUM DECISION AND ORDER AND ORDER - 24**

extend beyond those "reasonably related to the purposes of the project." Four alternatives were analyzed in the EA. In my opinion, the four alternatives analyzed constituted a reasonable range of alternatives in relation to the subject sheep permit renewals . . . . In particular, BLM was not required to also analyze a reduced grazing alternative, because its EA determined that the current level of sheep grazing is not negatively impacting the allotment.

AR 2037-38 (internal citations omitted).

e.    Impacts to Craters of the Moon National Monument and Wilderness Values

WWP also alleges that the geographic scope of the EA's Cumulative Impacts Assessment Area ("CIAA") is too narrow and that areas adjacent to the subject allotment which are also used for grazing should have been included in the cumulative impacts analysis. For example, Appellant points out that sage-grouse that breed on leks in the Big Desert Allotment may, in turn, nest in Monument lands to the west of the Big Desert Allotment and that those adjacent lands should have been included in the EA's cumulative impacts analysis.

. . . .

With respect to the CIAA issue, and WWP's allegation that the EA fails to address important sage-grouse habitat located off of the allotment to the west, once-again WWP presents no adequate allotment-specific probative evidence to establish that this omission would have materially changed BLM's cumulative impacts analyses. Therefore, in my opinion, BLM's final EA has not failed to analyze any substantial, cumulative issues of material significance.

AR 2029, 2038-39.

g.    Cumulative Impacts

BLM's EA analyzes cumulative impacts of past, present, and future potential agency actions, including historic sheep grazing, infrastructure developments, including fencing, vegetation, wildlife, wildlife habitats, and sensitive species, including sage-grouse. The EA and the Final Decisions correctly conclude that the instant proposed actions will not have cumulatively negative impacts upon associated rangeland resources, under circumstances where BLM had determined that the allotment is meeting, or making significant progress toward meeting, pertinent rangeland standards. Furthermore, the EA includes impacts analyses with respect to

**MEMORANDUM DECISION AND ORDER AND ORDER - 25**

cultural resources, economic and social values, invasive non-native species, migratory birds, soil resources, threatened and endangered animals, threatened and endangered plants, vegetation resources, visual resources, wilderness study areas, and wildlife resources. WWP has not proffered sufficient allotment-specific evidence to support its contention that climate change, drought, and wildfire, when combined with the impacts of grazing, will result in cumulative impacts to the allotment, and WWP's allegations with respect to this issue are based upon inference.

AR 2038.

25.   WWP did not appeal to the Interior Board of Land Appeals ("IBLA").  *See* Defs.'

SOF No. 32 (Docket No. 31) (citing AR 2050); *see also* Intervenor's SOF No. 13 (Docket No.

35, Att. 1) (citing same).

26.   Now, through the case filed in this federal court, WWP challenges Interior's

approval of the 15 BLM grazing decisions and BLM accompanying EA as violating NEPA,

FLPMA, and the APA.  WWP seeks the following relief: (1) reverse and vacate OHA's July 10,

2014 Order and Summary Decision; (2) order, adjudge, and declare that the BLM's final grazing

decisions, EA, and FONSI for the Allotment, as well as the OHA's July 10, 2014 Order and

Summary Decision violate FLPMA, NEPA, and the APA; (3) reverse and remand the BLM's

final decisions for the Allotment, and the BLM's EA and FONSI; and (4) enjoining BLM from

implementing, or proceeding with, any and all construction or ground-disturbing activities unless

and until such time as Defendant has completed a lawful analysis.  *See* Compl., pp. 1-2, 33-34

(Docket No. 1).

### III.  STANDARD OF REVIEW

The APA, 5 U.S.C. §§ 701-706, governs the Court's agency review under NEPA and

FLPMA.  *See ONRC Action v. Bureau of Land Mgmt.*, 150 F.3d 1132, 1135 (9th Cir. 1998).  The

Court must determine if the agency action in question was "arbitrary, capricious, an abuse of

**MEMORANDUM DECISION AND ORDER AND ORDER - 26**

discretion, or otherwise not in accordance with the law," or "without observance of procedure as required by law."  5 U.S.C. §§ 706(2)(A, D).[11]  This standard requires the Court to ensure that the agency has taken the requisite "hard look" at the environmental consequences of its proposed action, the agency's decision is based on a reasoned evaluation of all the relevant factors, and the agency has sufficiently explained why the project's impacts are insignificant.  *See National Parks & Conservation Assoc. v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001).

Nonetheless, this is a highly deferential standard and the Court must defer to an agency's decision that is "fully informed and well-considered."  *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1211 (9th Cir. 1998) (internal citation omitted).  The Court must be careful not to substitute its own judgment for that of agency experts.  *See Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir. 1993); *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989).  The APA "does not allow the [C]ourt to overturn an agency decision because it disagrees with the decision or with the agency's conclusions about environmental impacts."  *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010) (citation omitted).  Likewise, the "[C]ourt may not substitute its judgment for that of the agency concerning the wisdom or prudence of the agency's action."  *Id*. (citation and quotation marks omitted).  Even so, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Assn. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  In reviewing

---

[11]  This standard applies not only to agency decisions themselves, but also to appeals board decisions, like the OHA here.  *See Baker v. United States*, 613 F.2d 224, 226 (9th Cir. 1980) ("[R]eview is limited to an examination of whether the *decision of the [IBLA]* was arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or not in accordance with the law.") (emphasis added).

**MEMORANDUM DECISION AND ORDER AND ORDER - 27**

that explanation, the Court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id*. (citations omitted); *see also Marsh*, 490 U.S. at 378.  "This requirement is not particularly demanding." *Tabibian v. Secretary of the Interior*, 2016 WL 953246, *2 (D. Nev. 2016) (citing *Pub. Citizen, Inc. v. F.A.A.*, 988 F.2d 186, 197 (D.C. Cir. 1993)).  "Nothing more than a 'brief statement' is necessary, as long as the agency explains 'why it chose to do what it did.'" *Tabibian*, 2016 WL 953246 at *2 (quoting *Tourus Records, Inc. v. Drug Enforcement Admin.*, 259 F.3d 731, 737 (D.C. Cir. 2001)).  If the Court "can 'reasonably discern[ ]' the agency's path, it will uphold the agency's decision." *Tabibian*, 2016 WL 953246 at *2 (quoting *Pub. Citizen*, 988 F.2d at 197 (citing *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974))).

An agency decision is arbitrary and capricious where it "relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency [at the time of its decision] or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008) (quotations omitted). Here, WWP has the burden of showing that any decision or action by the BLM was arbitrary or capricious. *See Kleppe v. Sierra Club*, 427 U.S. 390, 412 (1976).

Summary judgment is appropriate if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  In APA actions, however, the Court's review is based on the agency's administrative record. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 883-84 (1990).  The Court's role is to determine whether the agency's record supports

the agency's decision as a matter of law under the APA's arbitrary and capricious standard of review.  *See Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994) ("[T]his case involves review of a final agency determination under the [APA]; therefore, resolution of this matter does not require fact finding on behalf of this court.  Rather, the court's review is limited to the administrative record . . . ."); *see also Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985).

## IV.  DISCUSSION AND RATIONALE

**A.      This Action is Properly Before This Court**

Interior and Intervenors raise two arguments, challenging WWP's ability to bring this action in the first instance: (1) WWP failed to fully participate in the pre-decisional public participation process; and (2) WWP failed to exhaust its administrative remedies by failing to appeal the OHA's Order and Summary Decision to the IBLA.  Neither argument is persuasive upon this record.

### 1.      WWP Appropriately Participated in the Administrative Process

Interior contends that all of WWP's claims should be dismissed because it failed to engage in the pre-decisional public participation process in order to have put the BLM on advance notice of WWP's concerns.  *See* Opp./Cross-MSJ, p. 13 (Docket No. 30, Att. 1) ("Because it is clear from the record that WWP had ample opportunities to raise its claims with BLM during the NEPA process when BLM could adequately consider and address them, WWP should be barred from raising them in this case.").  However, an issue of fact surrounds WWP's actual participation in the process – namely, whether BLM ever received WWP's May 29, 2012 letter (separate and apart from WWP's later-in-time December 18, 2012 protest).  Any question

**MEMORANDUM DECISION AND ORDER AND ORDER - 29**

in this respect is resolved in WWP's favor at this procedural stage and, therefore, precludes the entry of summary judgment against WWP on this discrete point.[12]

Moreover, a similar argument was considered – and rejected – by the OHA in its July 10, 2014 Order and Summary Decision. Therein, the ALJ resolved the same arguments vis à vis the circumstances leading up to the administrative appeal, concluding in relevant part:

> In effect, BLM argues that WWP lacks standing to appeal the instant decisions, because it failed to participate in various pre-decisional solicitations for public comments that were sent to interested publics by BLM, such as, BLM's circulation of the draft EA and BLM's circulation of the Proposed Decisions for public comment. While there is federal case law sustaining such an administrative, pre-decisional procedural requirements, such judicial decisions are premised upon specific, published regulatory requirements that mandate such pre-decisional participation in order to perfect standing to appeal, following a regulatory agency's ultimate final decision or implementing action. No such requirement appears in the Department's regulatory provisions that delineate the requirements to perfect standing for an appeal of a Taylor Grazing Act decision. The Department's pertinent regulatory requirement is one of actual alleged injury, a well-established test, in order to perfect standing to appeal a BLM Taylor Grazing Act decision, to wit:
>
>> Any applicant, permittee, lessee, or other person whose interest is adversely affected by a final BLM grazing decision may appeal the decision to an administrative law judge within 30 days after receiving it or within 30 days after a proposed decision becomes final as provided in Section 4160.3(a) of this title.
>
> In my opinion, the pre-decisional participation requirement advocated by the BLM would require a formal amendment of the Department's standing-related regulations with respect to the Taylor Grazing Act appeals. *This is because the "any other person whose interest is adversely affected test" makes clear that any "other person" who has been injured by BLM's decision may obtain standing to appeal, notwithstanding whether they have submitted predecisional comments, as might well be routinely expected from an "applicant, permittee, or lessee." Therefore, BLM's*

---

[12]  The fact that WWP's protest may have represented a scattershot of arguments, even if arguably only of a generic objection to BLM's proposed decisions, may speak to the merits of those arguments/objections; it does not undo WWP's efforts to participate in the administrative process itself.

**MEMORANDUM DECISION AND ORDER AND ORDER - 30**

> *request to dismiss all of WWP's claims, because of WWP's alleged failure to*
> *participate in pre-decisional public comment procedures, is **DENIED**.*

AR 2019-20 (quoting 43 C.F.R. § 4.70(a)) (underlining, bolding, capitalization in original; italics

added) (internal citation omitted).  The ALJ's rationale is sound and this Court likewise denies

Interior's Cross-Motion for Summary Judgment in this limited respect.[13]

    2.    WWP Sufficiently Exhausted Its Administrative Remedies

    WWP did not appeal the OHA's Order and Summary Decision to the IBLA.  From that,

Intervenors argue that this action should be dismissed because WWP failed to exhaust its

administrative remedies.  *See* Mem. in Supp. of MSJ, p. 5 (Docket No. 34, Att. 1) ("When WWP

failed to exhaust its administrative remedies by filing a timely notice of appeal, it became

precluded from seeking judicial review.").

    In this respect, the APA provides:

> Agency action made reviewable by statute and final agency action for which there
> is no other adequate remedy in a court are subject to judicial review. . . . .  Except as
> otherwise expressly required by statute, agency action otherwise final is final for the
> purposes of this section . . . unless the agency otherwise requires by rule and
> provides that the action meanwhile is inoperative, for an appeal to superior agency
> authority.

5 U.S.C. § 704.  Thus, under the APA, only final agency action is subject to judicial review and,

an agency action is not final if (1) the agency has adopted a rule requiring an administrative

---

[13]  To be clear, this Memorandum Decision and Order takes no position on whether WWP
strategically "kept its powder dry" as to its objections/concerns/comments surrounding the
BLM's decision-making process involving the Allotment.  However, to the extent this is the
case, it would not only seem to (1) run counter to various environmental statutes' public
comment requirement and related objectives, but also (2) potentially compromise the validity of
any legitimate criticism once it is actually made.  Alas, if WWP's goal in such respects is to
simply delay and postpone for the sake of delaying and postponing itself, that is unfortunate.
Regardless, without more, it does not *ipso facto* preclude WWP from pursuing this action in this
instance.

**MEMORANDUM DECISION AND ORDER AND ORDER - 31**

appeal before judicial review; and (2) the initial decision would be inoperative pending appeal.

*See Darby v. Cisneros*, 509 U.S. 137, 152 (1993).  Hence, to determine whether WWP was

required to appeal the OHA's Order and Summary Decision to the IBLA before bringing this

action, the applicable regulations must be examined.

Here, under 43 C.F.R. § 4.478(e), "[a]ny party adversely affected by the administrative

law judge's decision on the merits has the right to appeal to the [IBLA] under the procedures in

this part."  Such language does not clearly prescribe a *requirement* that WWP appeal the OHA's

Order and Summary Decision to the IBLA as a prerequisite for seeking judicial review, cutting

against a finding that the Order and Summary Decision itself was not a final, appealable agency

action.  Even so, it is not necessary to definitively decide that issue, because the second part of

the *Darby* test is nonetheless lacking.

Under 43 C.F.R. § 4.21(a)(2), "a decision becomes effective on the day after the

expiration of the time during which a person adversely affected may file a notice of appeal

unless a petitioner for a stay pending appeal is filed together with a timely notice of appeal."

That is, there is no automatic stay – indeed, the appellant must first petition for a stay pending

appeal and "bears the burden of proof to demonstrate that a stay should be granted."  43 C.F.R.

§ 4.21(b)(2).  It therefore cannot be said that OHA's Order and Summary Decision would be

inoperative pending appeal.  *See, e.g.*, *Montana Wilderness Ass'n v. Fry*, 310 F. Supp. 2d 1127,

1139 (D. Mont. 2004) ("Importantly, decisions appealed to the IBLA are not automatically

rendered inoperative during the appeal; rather, an aggrieved party must affirmatively 'request a

stay and make a compelling threshold showing to justify the stay.'  Consequently, this statute

vests discretion in the IBLA regarding whether to stay an appealed decision.") (quoting 43

**MEMORANDUM DECISION AND ORDER AND ORDER - 32**

C.F.R. § 4.21(b)); *San Juan Citizens' Alliance v. Babbitt*, 228 F. Supp. 2d 1224, 1233 (D. Colo. 2002) ("This process vests discretion in the [IBLA], whereas the APA requires unequivocally that the statute itself must deem an action *inoperative* while administrative appeal is pending.") (emphasis in original); *Oregon Natural Desert Ass'n v. Green*, 953 F. Supp. 1133, 1141-42 (D. Or. 1997) ("Here, the Department of Interior regulations do require exhaustion, but the regulation does not render the River Plan inoperative pending IBLA review.  Rather, the aggrieved party is required to request a stay and make a compelling threshold showing to justify the stay.  This process vests discretion in the IBLA to grant or deny a stay pending review.  The requirement under the APA is unequivocal.  As such, ONDA was not required to proceed with its appeal to the IBLA prior to seeking judicial review of the River Plan.") (internal citations omitted).

The appeal regulations arguably do not require an administrative appeal or automatically stay a decision pending appeal.  As such, WWP was not required to appeal the OHA's Order and Summary Decision to the IBLA before seeking judicial review.  The sense of this is apparent when realizing that there is no dispute that the OHA's Order and Summary Decision was, ultimately, a final, appealable agency action.  *See* AR 2050 (ALJ stating: "The time for filing an appeal from my summary decision of July 10, 2014, has expired, the decision having been received by certified mail by the Appellant on July 21, 2014, and by the Respondent on July 14, 2014.  Since no appeal has been filed, *my decision is the final action*.") (emphasis added). Intervenor's Motion for Summary Judgment is therefore denied in this limited respect.

## B.   The Process and Decisions of Interior/BLM Did Not Violate NEPA

WWP's Complaint raises four NEPA-related claims regarding the BLM's 15 final grazing decisions, alleging that Interior (1) failed to prepare an EIS; (2) "fail[ed] to consider an

**MEMORANDUM DECISION AND ORDER AND ORDER - 33**

adequate range of alternative courses of action that meet the stated need and purpose of the action"; (3) "fail[ed] to take the requisite 'hard look' at all the significant and potential direct and indirect environmental impacts of the proposed action"; and (4) "fail[ed] to fully consider the cumulative effects of the proposed action in association with past, present, and reasonably foreseeable future actions across the Big Desert Sheep allotment and surrounding allotments." Compl., ¶¶ 140 (a-d) (Docket No. 1).  These claims have been titrated since in the course of the litigation, leading to the current parameters of the parties' respective arguments on summary judgment with WWP now arguing more specifically:

> In the Big Desert Sheep allotment EA, BLM arbitrarily confined the geographic scope of its cumulative impacts assessment, and thereby deprived the public of a complete picture of the collective impacts of livestock grazing on the local sage-grouse population.  BLM declined to consider a reasonable alternative location for its proposed forage reserve, though the record reflects other locations would [be] less harmful to sage-grouse.  Further, the EA failed to analyze if or how grazing affects the frequency of fires on the allotment – despite BLM's finding that repeated fires have negatively impacted the native vegetation and wildlife on the allotment. Finally, the EA contains no analysis of potential indirect impacts to relict vegetation sites found on kipukas, which are important scientific and ecological values of both the Craters of the Moon National Monument and Preserve and the Great Rift WSA.

Opening SJ Brief, pp. 11-12 (Docket No. 22, Att. 1).

    1.    <u>NEPA Requirements Generally</u>

        a.    *NEPA's "Hard Look" Requirement*

NEPA "is our basic national charter for protection of the environment."  40 C.F.R. § 1500.1(a).  NEPA is a procedural statute that "'does not mandate particular results but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions.'"  *San Diego Navy Broadway Complex Coalition v. United States Dept. of Def.*, 817 F.3d 653, 659 (9th Cir. 2016) (quoting *Muckleshoot Indian Tribe v. United States Forest Serv.*, 177 F.3d 800, 814 (9th Cir. 1999)).  NEPA exists "to protect the

**MEMORANDUM DECISION AND ORDER AND ORDER - 34**

environment by requiring that federal agencies carefully weigh environmental considerations and consider potential alternatives to the proposed action before the government launches any major federal action." *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2004). "NEPA requires federal agencies to examine and disclose the environmental impacts of their proposed actions." *Pac. Coast Fed'n of Fishermen's Ass'n v. Blank*, 693 F.3d 1084, 1088 (9th Cir. 2012); *see also* 42 U.S.C. § 4332. The purpose of NEPA is: "(1) to ensure that agencies carefully consider information about significant environmental impacts and (2) to guarantee relevant information is available to the public." *Northern Plains Res. Council, Inc. v. Surface Transp. Bd.*, 668 F.3d 1067, 1072 (9th Cir. 2011). "In order to accomplish this, NEPA imposes procedural requirements designed to force agencies to take a 'hard look' at environmental consequences." *Lands Council*, 395 F.3d at 1027 (quoting *Earth Island Inst. v. United States Forest Serv.*, 351 F.3d 1291, 1300 (9th Cir. 2003)).

When reviewing an agency's decision, the Court's role is to determine whether the agency took the requisite "hard look" that NEPA demands and provided a "reasonably thorough discussion" of the probable, significant environmental consequences of the proposed action. *Nat. Parks & Conservation Ass'n v. Bureau of Land Mgmt.*, 606 F.3d 1058, 1072 (9th Cir. 2010). Courts review an EA "'to determine whether it has adequately considered and elaborated the possible consequences of the proposed agency action when concluding that it will have no significant impact on the environment.'" *San Diego Navy Brdwy. Complex Coal.*, 817 F.3d at 659 (quoting *San Luis Obispo Mothers for Peace v. Nuclear Regulatory Com'n*, 635 F.3d 1109, 1119 (9th Cir. 2011)). In doing so, the Court considers "'whether the EA fosters both informed decision-making and informed public participation.'" *San Diego Navy Brdwy. Complex Coal.*, 817 F.3d at 659 (quoting *Ctr. for Bio. Diversity v. NHTSA*, 538 F.3d 1172, 1194 (9th Cir. 2008)).

**MEMORANDUM DECISION AND ORDER AND ORDER - 35**

b.      *NEPA's EIS Requirement*

"NEPA requires that an [EIS] be prepared for all 'major Federal actions significantly affecting the quality of the human environment." *Nat. Parks & Conservation Ass'n*, 241 F.3d at 730 (quoting 42 U.S.C.A. § 4332(C)); *see also Ocean Advocates v. United States Army Corps of Eng'r*, 402 F.3d 846, 864-65 (9th Cir. 2005).  That is to say, an "EIS must be prepared if 'substantial questions are raised as to whether a project . . . may cause significant degradation of some human environmental factor.'" *Blue Mts.*, 161 F.3d at 1212 (quoting *Idaho Sporting Congress v. Thomas*, 137 F.3d, 1146 1149 (9th Cir. 1998)).

The regulations define "significantly" in NEPA as calling for an analysis of both "context" and "intensity."  40 C.F.R. § 1508.27; *see also Native Ecosystems Council v. United States Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005) ("In benchmarking whether the [ ] Project may have a significant effect on the environment, we turn to the NEPA regulations that define 'significantly.'") (citing 40 C.F.R. § 1508.27).  "Context" is "society as a whole (human, national), the affected region, the affected interests, and the locality."  40 C.F.R. § 1508.27(a). "Intensity" "refers to the severity of impact" and is evaluated or measured by certain listed factors.  40 C.F.R. § 1508.27(b)(1-9) (discussing various factors that should be considered in evaluating intensity).

Generally, an agency must prepare an EIS if the environmental effects of a proposed agency action are highly uncertain.  *See Blue Mts.*, 161 F.3d at 1213 ("significant environmental impact" mandating preparation of EIS where "effects are 'highly uncertain or involve unique or unknown risks'"); 40 C.F.R. § 1508.27(b)(5).  Preparation of an EIS is mandated where uncertainty may be resolved by further collection of data, or where the collection of such data may prevent "speculation on potential . . . effects.  The purposes of an EIS is to obviate the need

**MEMORANDUM DECISION AND ORDER AND ORDER - 36**

for speculation by insuring that available data are gathered and analyzed prior to the implementation of the proposed action." *Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1195 (9th Cir. 1988); *see also Blue Mts.*, 161 F.3d at 1213-14 (lack of supporting data and cursory treatment of environmental effects in EA does not support refusal to produce EIS).

In reviewing an agency's decision not to prepare an EIS, the question is "whether the agency took a 'hard look' at the potential environmental impact of the Project." *Blue Mts.*, 161 F.3d at 1212. Courts use the arbitrary and capricious standard when reviewing an agency's decision to not complete an EIS. *See id.* at 1211. Under that standard, the Court must determine whether the agency has taken the requisite "hard look" at the environmental consequences of the proposed actions, based its decision on a consideration of the relevant factors, and provided a convincing statement of reasons explaining why the Project's impacts are insignificant. *See Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir. 2000); *Blue Mts.*, 161 F.3d at 1211. "A full [EIS] is not required if the agency concludes after a good hard look that the proposed action will not have a significant environmental impact." *Tillamook Cnty. v. United States Army Corps of Eng'rs*, 288 F.3d 1140, 1144 (9th Cir. 2002).

Where, as here, the agency concludes there is no significant effect associated with the proposed Project, it may issue a FONSI in lieu of preparing an EIS. *See Envtl. Prot. Info. Ctr. v. United States Forest Serv.*, 451 F.3d 1005, 1009 (9th Cir. 2006); *see also Wetlands Action Network v. United States Army Corps of Eng'rs*, 222 F.3d 1105, 1121 (9th Cir. 2000); 40 C.F.R. § 1508.13; 40 C.F.R. § 1508.9(a)(1). However, an agency "cannot avoid preparing an EIS by making conclusory assertions that an activity will have only an insignificant impact on the environment." *Ocean Advocates*, 402 F.3d at 864. The agency "must supply a convincing

**MEMORANDUM DECISION AND ORDER AND ORDER - 37**

statement of reasons to explain why a Project's impacts are insignificant." *Blue Mts.*, 161 F.3d

at 1212 (internal quotations omitted).

If the reasons for a finding of no significant impacts are arbitrary and capricious and the

complete administrative record demonstrates that the Project may have a significant impact on

the environment, ordering the preparation of an EIS is appropriate. *See Ctr. for Bio. Diversity*,

538 F.3d at 1179.  Sensibly, in such a setting, an agency may first prepare an EA to decide

whether the environmental impact is significant enough to warrant preparation of an EIS.  An

EA is a "concise public document . . . [that] [b]riefly provide[s] sufficient evidence and analysis

for determining whether to prepare an environmental impact statement or a finding of no

significant impact."  40 C.F.R. § 1508.9.  As mentioned earlier, an EA is arbitrary and capricious

if it fails to consider an important aspect of the problem, or "offer[s] an explanation that runs

counter to the evidence before the agency, or is so implausible that it could not be ascribed to a

difference in view or the product of agency expertise." *Sierra Club v. United States Envtl. Prot.*

*Agency*, 346 F.3d 955, 961 (9th Cir. 2003).

       2.    <u>Interior's/BLM's Cumulative Impact Assessment Area ("CIAA") Analysis Was</u>
            <u>Not Arbitrary and Capricious</u>

NEPA requires that an agency proposing major federal action analyze the cumulative

effects of past, present, and reasonably foreseeable actions. *See* 40 C.F.R. § 1508.7.  This

analysis requires "a reasonably thorough discussion of the significant aspects of the probable

environmental consequences." *Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 343 (9th Cir. 1996)

(citations omitted).  NEPA does not impose any particular geographic area or timeframe on the

cumulative effects analysis; instead, identifying the spatial and temporal scope of the cumulative

effects analysis is a task assigned to the special competency of the agency and is given

**MEMORANDUM DECISION AND ORDER AND ORDER - 38**

considerable deference by the courts.  *See Kleppe*, 427 U.S. at 413-14; *see also Sierra Club v. Bosworth*, 510 F.3d 1016, 1030 (9th Cir. 2007) ("[W]e recognize that the determination of the extent and effect of [cumulative effect] factors, and particularly identification of the geographic area within which they may occur, is a task assigned to the special competency of the appropriate agencies . . . .") (internal quotation marks and citation omitted); *see also Neighbors of Cuddy Mountain*, 303 F.3d 1059, 1071 (9th Cir. 2002) ("[U]nder NEPA we defer to an agency's determination of the scope of its cumulative effects review.").  Still, an agency must provide "some quantified or detailed information; . . . [g]eneral statements about possible effects and some risk do not constitute a hard look absent a justification regarding why more definitive information could not be provided."  *Ocean Advocates*, 402 F.3d at 868.  This cumulative analysis "must be more than perfunctory; it must provide a useful analysis of the cumulative impacts of past, present, and future projects."  *Id.*

Here, WWP argues that Interior "violated NEPA by failing to analyze the cumulative impacts of the action on sage-grouse in adjacent and nearby allotments," in particular, allotments situated to the west of the Allotment.  *See* Opening SJ Brief, p. 13 (Docket No. 22, Att. 1); *see also id.* at p. 16 ("Thus, by not including the important sage-grouse areas directly west of Big Desert Sheep allotment in the EA's CIAA, BLM, 'like a horse with blinders,' failed to consider the impacts to sage-grouse from its proposed action in combination with grazing on those other allotments.") (quoting *Western Watersheds Project v. Bennett*, 392 F. Supp. 2d 1217, 1221-23 (D. Idaho 2005)).  Though it is certainly possible to argue that BLM could have included those other areas in its EA's cumulative impacts analysis, WWP has not demonstrated that the CIAA itself was arbitrary or capricious by the decision of the BLM not to include those areas.

**MEMORANDUM DECISION AND ORDER AND ORDER - 39**

In pondering these particular points of dispute, the Court has considered (among many things) the context of the Allotment footprint and the adjacent areas. The CIAA represents a much larger area than just the Allotment – more than twice the size of the Allotment in fact, at 623,381 versus 236,990 total acres. AR 440. And, while most of the CIAA is north of the Allotment (with the highest lek concentrations), the BLM's cumulative impacts analysis considered an even larger area in the context of sage-grouse – specifically, a five-mile buffer zone surrounding the entire Allotment, including to the west of the Allotment. AR 417 ("There are thirty known sage-grouse leks within the allotment and another sixty-five leks within five miles of the allotment. . . . . Analysis of occupied lek data gathered by Idaho Fish and Game and BLM within 5 miles of the allotment show sage-grouse populations fluctuate annually and are currently at their ten year average."); AR 419 ("There would be no impacts to Threatened and Endangered Species under any of the alternatives as there have been no known occurrences within 5 miles of the allotment in the last 10 years."); AR 1992 (EA's Exhibit 34, identifying CIAA boundary and all known sage-grouse leks therein (none to the immediate west of the Allotment)). Further, the BLM's cumulative impacts considered the overall Snake-Salmon-Beaverhead sage-grouse population, which includes an area much larger than the Allotment, including lands to its west. AR 417 ("Sage-grouse within the Big Desert Sheep Allotment are part of the Snake-Salmon-Beaverhead ID population. . . . . The current three-year average males per lek are 17.88, which is over 150% of the baseline period. The current three-year average for males on active leks is 31.25, which is also over 150% of the average males for active leks.") (citation omitted); AR 445-46 ("Sage-grouse within the CIAA are part of a larger population known as the Snake-Salmon-Beaverhead population. A population viability analysis for the

**MEMORANDUM DECISION AND ORDER AND ORDER - 40**

Snake-Salmon-Beaverhead population was completed by Garton et al. (2011). . . . .  This

analysis included sage-grouse meta-populations within the CIAA.  Garton et al. (2011) found

that the Snake-Salmon-Beaverhead population had a 0%-27% chance of falling below

population viability levels (≥ male sage-grouse) in the next 100 years.").

     But more importantly, the BLM reasonably concluded that properly-managed grazing on

the Allotment does not significantly impact sage-grouse or sage-grouse breeding and lekking

activities, in part because grazing is not currently having significant impacts on the lands.  AR

383 (noting that Standards 4 and 8 of Idaho Standards for Rangeland Health were not being met,

but nonetheless making significant progress toward being met, before concluding that the

frequency and size of wildfires in the Allotment have greatest impact on rate of shrub

establishment, but that "grass and forb components are productive and healthy within the

[Allotment]."); AR 419 ("Livestock management practices that provide for the sustainability of

perennial grasses and forbs generally maintain or minimally impact sage-grouse habitat. . . . .

There would be no impacts to Threatened and Endangered Species under any of the alternatives

as there have been no known occurrences [of livestock grazing having direct/indirect impacts on

sage-grouse during nesting] within 5 miles of the allotment in the last 10 years.") (citation

omitted).

     As a counterbalance to these realities in the cumulative impacts analysis context, the

OHA's Order and Summary Decision found that the "WWP presents no adequate allotment-

specific probative evidence to establish that [omitting a discussing of impacts to the Allotment's

west] would have materially changed BLM's cumulative impacts analysis."  AR 2038-39.

Beyond its arguments – more conclusory than not – pertaining to the criticism that the CIAA

should have incorporated a more westerly approach to its cumulative impacts analysis, WWP's

**MEMORANDUM DECISION AND ORDER AND ORDER - 41**

briefing in this record is similarly lacking on this point.  In short, the BLM went beyond

generalized statements about possible effects, taking the necessary "hard look" at the grazing

permits' cumulative impacts upon sage-grouse populations on the Allotment itself, as well as

neighboring allotments.

With all this in mind, the alleged shortcomings relating to the BLM's cumulative impacts

analysis are not as stark as WWP argues and, likewise, the cases WWP cites in support of its

position on the issue are distinguishable.  As such, WWP has not shown that the BLM's

cumulative impacts analysis was inappropriate.  Interior's/BLM's CIAA analysis was not

arbitrary or capricious.  In this limited respect, WWP's Motion for Summary Judgment is denied,

and Interior's Cross-Motion for Summary Judgment, and Intervenor's Motion for Summary

Judgment are granted.

       3.      <u>The Decision of Interior/BLM Regarding the Forage Reserve's Location Was Not Arbitrary or Capricious</u>

NEPA requires that agencies specify the purpose and need for a proposed action and

analyze the environmental consequences of the proposed action as well as a reasonable range of

alternative actions.  *See* 40 C.F.R. §§ 1502.13, 1502.14; *see also Envt'l Prot. Info. Ctr. (EPIC) v.*

*U.S. Forest Serv.*, 234 Fed. Appx. 440 (9th Cir. 2007) (applying purpose and need and range of

alternative requirements to EA).  Project alternatives derive from the stated purpose and need;

hence, the goal of a project necessarily dictates the range of reasonable alternatives.  *See*

*Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 865 (9th Cir. 2004); *see also*

*League of Wilderness Defenders-Blue Mts. Biodiversity Project v. U.S. Forest Serv.*, 689 F.3d

1060, 1069 (9th Cir. 2012) (scope of alternative analysis depends on underlying purpose and need

specified by agency).  This "alternatives provision" applies whether an agency is preparing an

EIS or an EA and requires the agency to give full and meaningful consideration to all reasonable alternatives.  *See Native Ecosystems*, 428 F.3d 1233, 1245 (9th Cir. 2005).  However, "an agency's obligation to consider alternatives under an EA is a lesser one than under an EIS."  *Id.* at 1246.  "[W]hereas with an EIS, an agency is required to '[r]igorously explore and objectively evaluate all reasonable alternatives," with an EA, an agency only is required to include a brief discussion of reasonable alternatives."  *N. Idaho Cmty. Action Network v. U.S. Dep't of Transp.*, 545 F.3d 1147, 1153 (9th Cir. 2008) (quoting 40 C.F.R. § 1502.14(a), citing 40 C.F.R. § 1508.9(b)).  NEPA does not require federal agencies to assess, consider, and respond to public comments on an EA to the same degree as it does for an EIS.  *See In Def. of Animals, Dreamcatcher Wild Horse & Burro Sanctuary v. U.S. Dep't of Interior*, 751 F.3d 1054, 1073 (9th Cir. 2014).

Here, WWP argues that "Interior's failure to study reasonable alternatives was arbitrary and capricious and violated NEPA" because the BLM failed to consider an alternate location site for Alternative C's forage reserve further to the east.  Opening SJ Brief, p. 17 (Docket No. 22, Att. 1).  More to-the-point, WWP contends:

> WWP recommended that BLM analyze a location for the forage reserve in the east part of the allotment, where its considerable ground disturbance, infrastructure, and additional grazing pressure would be further from known sage-grouse leks and their associated nesting areas; within unclassified or general sage-grouse habitat instead of priority habitat; and adjacent to roads and already-disturbed agricultural lands. According to BLM, sage-grouse no longer use the eastern portion of the allotment. However, BLM refused to consider any alternate sites for its proposed forage reserve.

*Id.* at pp. 17-18 (internal citations omitted).  Again, while relocating the forage reserve elsewhere in the Allotment was an option, BLM's decision not to pursue WWP's recommendation is neither arbitrary nor capricious in this instance.

**MEMORANDUM DECISION AND ORDER AND ORDER - 43**

Initially, as observed by the Ninth Circuit, the Court is "aware of no Ninth Circuit case where an EA was found arbitrary and capricious when it considered both a no-action and a preferred action alternative." *Earth Island*, 697 F.3d at 1022.  On this point, the Ninth Circuit commented:

> For instance, in *Native Ecosystems Council*, we explained that NEPA's implementing regulations merely require an EA to include consideration of appropriate alternatives, including a "no action" alternative and the agency must designate a "preferred" alternative.  Beyond that, NEPA's statutory and regulatory requirements do not dictate the minimum number of alternatives that an agency must consider.  Therefore, in *Native Ecosystems Council*, we upheld the Forest Service's consideration of a no action alternative and its preferred alternative, even though no other alternatives were considered in detail.
>
> Similarly, in *North Idaho Community Action Network*, we held that the agency had fulfilled its obligation under NEPA's alternatives provision when it considered and discussed only two alternatives in the EA.  These two alternatives were identical to those in this case: the Project with the changes proposed in the EA, and the Project without the proposed changes.  Notably, in *North Idaho Community Action Network*, we did not even discuss the other alternatives the agency had rejected and whether the agency had provided sufficient reasons for rejecting the alternatives.  We merely explained that, because the Forest Service briefly discussed two alternatives, and because the Project proposed in the 2005 EA will not result in significant environmental effects," the analysis was sufficient.

*Id*. (internal quotations and citations omitted).

In contrast, the Court notes that the EA at issue here considered *four* separate alternatives (including Alternative C's forage reserve option) that align with the "purpose and need" for grazing permit renewal on the Allotment.  *See* AR 983 ("The purpose of the proposed action is to authorize livestock grazing consistent with BLM policy and in a manner that maintains or improves resource conditions and achieves the objectives and desired conditions described in the Big Desert [Management Framework Plan] and the Craters of the Moon National Monument and Preserve [Resource Management Plan].  The action is needed to address the operators'

**MEMORANDUM DECISION AND ORDER AND ORDER - 44**

applications for permit renewal in the Big Desert Sheep Allotment."); *see also* AR 986-87
(discussing various plans' objective to "maintain, protect, and expand sage-grouse source
habitat"); AR 1020-21 (same).

As to forage reserves generally, the BLM's EA clearly described the potential of such
reserves to effectively restore sage-grouse habitat:

> The [Fire, Fuels, and Related Vegetation Management Direction Plan Amendment
> (amending the Big Desert MFP)] has a list of "Selected Conservation Measures to
> be Considered in Developing Vegetation Treatments Potentially Affecting Greater
> Sage-Grouse."  One measure is to "Reduce competition of crested wheatgrass to
> facilitate the establishment and persistence of the desired species."  Development of
> a forage reserve is also supported in the state sage-grouse conservation plan.  The
> Idaho Sage Grouse Conservation Plan (2006) states that areas should be identified
> and when feasible, establish strategically located forage reserves focusing on areas
> unsuitable for sage-grouse habitat restoration, or lower priority habitat restoration
> areas.  These reserves (such as seedings) would serve to provide livestock operators
> with temporary alternative forage opportunities during the resting of recently seeded
> restoration or fire rehabilitation areas and could serve as additional fuel breaks
> depending on location and configuration, due to reduced fuel loads.

> Currently, the availability of forage reserves in Idaho is extremely limited.  Without
> the development of additional reserves, economic incentives, or other processes, the
> restoration of Idaho's annual grasslands and diversification of exotic perennial grass
> seedings will proceed slowly, and both operators and sage-grouse will continue to
> remain at risk of wildfires and their associated after-effects. Pellant and Lysne
> (2006) show that livestock grazing can facilitate an increase in the diversification of
> crested wheatgrass or similar seedings.  Another benefit of livestock use at the
> appropriate time and intensity in crested wheatgrass seedings is to facilitation the
> return of sagebrush.  Sagebrush encroachment ins seedings is less under light to
> moderate spring livestock use, but increases under higher crested wheatgrass
> utilization levels for the same period of time (Frischknecht and Harris, 1968).  A
> grazing system that promotes heavy spring livestock use over a period of years can
> promote an increase of sagebrush in crested wheatgrass seedings.  Angell (1997)
> found that this same grazing management system would also promote the survival
> of juvenile sagebrush plants due to decreased soil water depletion by crested
> wheatgrass.  Thus, once juvenile sagebrush plants are established in a seeding,
> continued heavy livestock use will accelerate sagebrush growth and potentially
> increase additional sagebrush recruitment.  Without deliberate intervention to
> improve plant species diversity and structure, some large seeded grasslands are
> unlikely to support habitat characteristics suitable for sage-grouse within a

> reasonable management timeframe (Big Desert Conservation Plan, 2010).  A forage reserve would allow for increased management flexibility in attaining an increased sagebrush canopy cover.  The forage reserve would also be used to facilitate other resources objectives such as riparian recovery or to provide rest to improve herbaceous cover in certain nesting or brood habitat areas (IDFG 2006).

AR 420-21; *see also* AR 448 ("Both the Sage Grouse Comprehensive Conservation Strategy (2006) and the Big Desert Sage-Grouse Planning Areas Conservation Plan (2010) suggest pursuing opportunities for forage reserves to accommodate livestock operators during implementation of rehabilitation and restoration activities. . . . .  These measures would facilitate resource objectives such as providing rest to improve herbaceous cover in certain nesting and brood-rearing areas.").

And, as to the actual forage reserve contemplated within Alternative C, the EA determined that it was far enough away from active sage-grouse leks and sage-grouse habitat to ensure that it would not materially impact sage-grouse populations.  *See, e.g.*, AR 421-22 ("The nearest occupied lek is greater than 1.75 miles from the proposed forage reserve fence. . . . . Potential impacts to sage-grouse are minimal due to the lack of suitable sage-grouse habitat and distance to occupied leks.  Fence posts would provide perches for predators of sage-grouse nests and chicks but the distance to suitable sage-grouse habitat diminishes the potential for predators to be successful from fence posts."); AR 448 ("A primary objective of the fence is to benefit greater sage-grouse habitat by increasing sagebrush cover in a crested wheatgrass seeding. . . . . Currently, over 80% of the proposed forage reserve is dominated by crested wheatgrass. . . . ."); AR 448-49 ("The portion of the proposed fence located within 2 miles of an active lek would be made more visible by adding reflectors, if subsequent observations determine that sage-grouse are striking the new fence in other locations, the fence would be modified to make it more visible

**MEMORANDUM DECISION AND ORDER AND ORDER - 46**

by adding reflectors."); AR 449 ("The area of the proposed forage reserve is in priority sage grouse habitat that currently lacks sagebrush plants.  Without taking some kind of action the crested wheatgrass seeding will continue to have an absence of sagebrush cover.  Sagebrush cover would increase in the forage reserve considerably more in Alternative C than the other alternatives."); AR 1143 (collision risk model near forage reserve indicating less than low risk of fence collision on forage reserve).

From such details, the OHA's Order and Summary Decision ruled that WWP had not demonstrated that the forage reserve negatively impacts sage-grouse populations.  This Court is in agreement.  The Court acknowledges that a choice could have been made to locate the forage reserve in a different, more easterly, portion of the Allotment, and there are those, including the WWP, who would have placed such a reserve in that portion of the Allotment, rather than in the location chosen by the BLM.  But the BLM's different decision on this subject was not arbitrary or capricious in light of the full array of the record underlying that decision.  In other words, the BLM satisfied its obligation under NEPA to consider alternatives to its action.  In this limited respect, WWP's Motion for Summary Judgment is denied, and Interior's Cross-Motion for Summary Judgment, and Intervenor's Motion for Summary Judgment are granted.

4.    The EA Adequately Considered Fire Frequency on the Allotment

Arguing that "the EA did not analyze whether the proposed grazing would perpetuate the altered fire cycle or worsen it," WWP claims that Interior failed to consider a significant aspect of the environmental impact of its grazing decisions in violation of NEPA.  Opening SJ Brief, p. 21 (Docket No. 22, Att. 1).  In essence, WWP posits that heavy livestock grazing encourages the spread of cheatgrass; cheatgrass fuels larger, more frequent wildfires; wildfires curb sagebrush

(sage-grouse habitat) growth; and the EA did not adequately consider this paradigm.  *See id*. at

pp. 21-22 (citing Pl.'s SOF Nos. 19, 22-24 (Docket No. 23)).

       No one appears to question that livestock grazing practices *can* impact fire frequency and

intensity.  But, there is no evidence that the historical grazing activity on the Allotment has done

so.  The OHA's Opinion and Summary Decision references that, "wildfires have caused historic

problems on the allotment, but . . . grazing is not largely responsible for such problems, because

grazing, in fact, has been historically relatively light on the allotment."  AR 2036 (citing AR 429

(EA stating: "Historically, the allotment has exhibited light (21-40%) overall utilization.")).

Said another way, WWP points to no evidence that livestock grazing on the Allotment has

actually contributed to the understood incidences of wildfires on the Allotment.  In this setting,

simply describing a possible relationship does not make it so, nor does it make it inescapably

necessary that the possibility of such a nexus must move the needle of the BLM's decision

process.

       Yet, to be clear, it is true that wildfire is the cause of some resource problems on the

Allotment.  *See, e.g.*, AR 416 ("due to recent wildfires, there is limited key sage-grouse habitat

identified within the Big Desert Sheep Allotment."); AR 425 ("Since 1970, only nine percent of

the public land within the allotment has not been affected by wildfire, and large portions of the

allotment have been burned repeatedly in the same time period.").  Additionally, the EA contains

a recognition that livestock grazing can be a vector for the spread of invasive species (like

cheatgrass), and that such species contribute to increased fires.  *See* AR 408 ("Livestock are one

vector in the transport of invasive species, and the potential for establishment of invasive, non-

native species would be slightly higher [for Alternative C] than Alternative A and B.").

**MEMORANDUM DECISION AND ORDER AND ORDER - 48**

However, the record shows that since 1999, the BLM's actual management of grazing on the Allotment is consistent with maintaining quality conditions.  *See, e.g.*, 6/30/14 Decl. of Jeremy Casterson, ¶ 17 (AR 1881) ("BLM previously assessed conditions on the Big Desert Sheep Allotment in 1999.  At that time, BLM found that the allotment was meeting all of the Idaho Standards for Rangeland Health.  Since that time, the only major change to the allotment has been that several large fires have burned most of the allotment."); AR 383 (noting that Allotment is not meeting two standards currently, but that, even with grazing, Allotment is making significant progress toward meeting those same two standards); AR 429 ("The Evaluation for the Big Desert Sheep Allotment found that the native plant communities were making significant progress towards meeting the standard for Rangeland Health.").  Further, notwithstanding the relatively light average grazing on the Allotment, the EA also describes the BLM's invasive species control program, addressing any possible link between grazing, cheatgrass, and wildfires. *See* AR 408 ("The USFO would continue to monitor and treat invasive, non-native species within the Big Desert Sheep Allotment following an integrated weed management approach (USDI-BLM-2009b).  Continuing to treat known infestations in the allotment would ensure that Standards 4 and 8 would continue to make significant progress toward meeting standards.").[14]

---

[14]  Similarly, and specifically as to Alternative C, the EA recognized that

The potential increase of cheatgrass as well as other invasive/noxious weeds would be minimal because the proposed location of the fences would not be cleared or bladed before construction.  However, all project areas would be monitored closely for new occurrences of noxious weeds.  All new and existing infestations would continue to be aggressively treated. . . . .  Successful noxious weed treatments, along with changes in authorized use described in Alternative C, would help the allotment continue to make significant progress toward meeting Standards 4 and 8.

AR 408.

**MEMORANDUM DECISION AND ORDER AND ORDER - 49**

There is evidence to support the BLM's conclusion that light grazing on the Allotment is not the root cause of its wildfires.  There is no reason, on this record, to replace some opposing viewpoint for the OHA's finding that grazing "is not largely responsible" for the historic wildfire problems.  In this limited respect, WWP's Motion for Summary Judgment is denied, and Interior's Cross-Motion for Summary Judgment, and Intervenor's Motion for Summary Judgment are granted.

     5.     <u>Interior/BLM Appropriately Analyzed the Effects of its Decisions on Monument Objects and Important Wilderness Values</u>

There are no kipukas within the boundaries of the Allotment.  *See* 6/30/14 Decl. of Jeremy Casterson, ¶ 18 (AR 1881); *see also* AR 1142 (map showing kipuka locations).  As a result, Interior admits that the EA did not address the grazing decisions' risks to kipukas.  *See* Opp./Cross-MSJ, p. 23 (Docket No. 30, Att. 1).  Regardless, WWP argues that "BLM violated NEPA because it failed to consider potential negative impacts from its actions on the relict ecosystems of the kipukas in the surrounding Great Rift landscape."  Opening SJ Brief, p. 22 (Docket No. 22, Att. 1).  The undersigned disagrees.

Kipukas largely exist to the Allotment's west – some of them are even situated on, or very near, the Allotment's boundary.  *See* AR 1142.  However, despite WWP's generic claims that "[t]hese kipukas can be affected by management on the Allotment," it points to no real evidence of this ever happening.  *See* Opening SJ Brief, p. 25 (Docket No. 22, Att. 1).  Significantly, the BLM's Upper Snake Field Office (1) does not authorize livestock to enter kipukas near the Allotment, and (2) has no evidence that livestock permitted to graze on the Allotment have ever entered into a nearby kipuka (intentionally or unintentionally).  *See* 6/30/14 Decl. of Jeremy Casterson, ¶¶ 18-19 (AR 1881).  The record does not indicate otherwise.

**MEMORANDUM DECISION AND ORDER AND ORDER - 50**

Moreover, WWP's concern that "seed dispersal by wind" can "spread and alter remaining healthy plant communities" (including, presumably, kipukas), while understandable, is simply an inchoate concern on this record.  *See* Opening SJ Brief, p. 25 (Docket No. 22, Att. 1).  WWP presents no evidence of this ever happening to any kipuka near the Allotment's boundary.  Perhaps this is so because prevailing winds in the area most commonly blow west to east – away from the kipukas.  *See* 6/30/14 Decl. of Jeremy Casterson, ¶ 19 (AR 1881).

In short, the Court is not persuaded upon the legal standards that it must draw upon here, that the BLM's managed grazing on the Allotment has ever negatively impacted a neighboring kipuka.  Absent evidence of the potential for a significant environmental impact, "WWP has provided inadequate allotment-specific evidence to carry its burden of proof" on this claim.  In this limited respect, WWP's Motion for Summary Judgment is denied, and Interior's Cross-Motion for Summary Judgment, and Intervenor's Motion for Summary Judgment are granted.

## V.  <u>ORDER</u>

Based on the foregoing, IT IS HEREBY ORDERED that:

1.      WWP's Motion for Summary Judgment (Docket No. 22) is DENIED.

2.      Interior's Cross-Motion for Summary Judgment (Docket No. 30) is GRANTED, in part, and DENIED, in part, as follows:

    a.      WWP appropriately participated in the administrative process; in this respect, Interior's Cross-Motion for Summary Judgment is DENIED.

    b.      Interior/BLM did not violate NEPA; in this respect, Interior's Cross-Motion for Summary Judgment is GRANTED.

3.      Interior's Motion to Strike New Evidence (Docket No. 33) is DENIED, as moot.

**MEMORANDUM DECISION AND ORDER AND ORDER - 51**

     4.      Intervenor's Motion for Summary Judgment (Docket No. 34) is GRANTED, in part, and DENIED, in part, as follows:

     a.      WWP sufficiently exhausted its administrative remedies; in this respect, Intervenor's Motion for Summary Judgment is DENIED.

     b.      Interior/BLM did not violate NEPA; in this respect, Intervenor's Motion for Summary Judgment is GRANTED.

DATED:  **September 30, 2016**

_____
Honorable Ronald E. Bush
Chief U. S. Magistrate Judge

**MEMORANDUM DECISION AND ORDER AND ORDER - 52**